Before we get started, we have an administrative type matter that we'd like to address, and this is the admission to the bar of Diane E. Grist. Diane, can you stand? Colleagues of the Court, I move for the admission of Diane E. Grist as a member of the bar. She's a member of the bar and is in good standing with the highest courts of California and the District of Columbia. I have knowledge of her credentials and am satisfied that she possesses the necessary qualifications. Diane, they say that time flies when you're working hard. I certainly believe that, and if that is true, then this past year must have been nothing but a blur for you because you certainly have been working hard. And if you represent the quality of the bar in your age group, then I feel secure that the meaningful development of the law and the endurance of our legal system is in good hands. Judge Reina, your motion is granted and the applicant will be admitted. She will now face the clerk to administer the oath. Please raise your right hand. Do you solemnly swear and affirm that you will comport yourself as an attorney and counsel of this court, upright and according to law, and that you will support the Constitution of the United States of America? I do. Welcome to the bar of the United States Court of Appeals. Okay. We have four cases before the court today. One case is on the briefs. The other cases are set for argument this morning. Our first case is 17-1947, Anacor Pharmaceuticals versus Iancu. Mr. Kennedy, and you reserve five minutes of your time? That's correct, Your Honor. Let me point something out. Most or a lot of the record is more confidential and portions of the brief is more confidential. I'm sorry, this is another case. Okay, let's go forward then. May it please the court. Anacor was deprived of its due process and APA guarantees in this case because the board invalidated Claim 6 based on an argument that appears nowhere in the petition. Specifically, the theory on which the board found a reasonable expectation of success in arriving at Claim 6 was advanced by petitioner for the first time on reply. The reference common to Claim 6, but Austin contains in vitro data only for treating a yeast called C. albicans. Claim 6 is limited to treating onychomycosis caused by a certain dermatophyte. So the petition needed to create a link between Austin and the secondary references, Greyhose and Freeman, that would give rise to a reasonable expectation of success in using this by arguing that the compounds in Austin and the compounds disclosed by the secondary references would be combined because those compounds had structural similarity with each other and they also had allegedly overlapping functional activity. Austin had in vitro data for C. albicans, Greyhose had in vitro data for C. albicans, and Freeman had in vitro data for and you would assume that because Austin had overlapping functional activity, Austin's compounds would also work against dermatophytes. Mr. Kennedy, I'm going to interrupt in your presentation because as I read the petition and then ultimately comparing it with the decision of the board, it looked to me as if the theory was exactly the same. There was not total reliance on structure. Structure was alluded to, but function was very important and the factor of low molecular weight of Tavropol was a factor that was considered. But if you read the petition and you read the decision, they look quite similar in what they say. Now, it is true that there was additional evidence that was relied on by the Merton and Siegel references, for example, but that's different, it seems to me, from saying that they adopted a new theory. So, as I take it, the thrust of your argument really is a challenge to the admission of Merton and Siegel, is it not? Well, Merton and Siegel are certainly new references, but I would direct your honor to appendix 30 and 31, which is the board's findings on whether there would be a reasonable expectation of success in combining Austin and Greyhose, and then they carried over those findings to ground two. But structural similarity was the basis for motivation to combine a reasonable expectation of success. Structural similarity had nothing to do with the ultimate outcome for that issue. Well, you say it was the basis. Structural similarity was never the sole basis on which the petition was predicated or the petitioners proceeded, as I read the record. Function was, it seems to me, as I read the record, more important than structure. And the board referred to the fact that both of the compounds in Austin and Greyhose were boron heterocycles, so there was similar structure, but they didn't put, neither the board nor the petition seemed to put great weight on that. Well, here's how we know that reasonable expectation of success did not turn at all on structural similarity. The board at pages 30 and 31 of its decision cited the new evidence, Siegel, Nomura, and Merton, and said because those references show that a given compound against C. albicans would be even more effective against dermatophytes, therefore there's a reasonable expectation of compounds. At that point, the board has completely stopped looking at the structural similarity between the Austin compounds and any other sets of compounds. In other words, let me put it a different way. In the petition, the relevance of the C. albicans data in Austin is only because Greyhose also shows activity against C. albicans, therefore that's an overlapping functional activity that gives rise to an inference that taboborol will also work against dermatophytes. Now, in the way the petition or the way the final written decision played out, you don't need to know anything about anything except that taboborol has activity against C. albicans, because then what the board did was it combined it with all the new evidence that came in after the petition to say, well, if this compound works against C. albicans, it will work even better against the dermatophyte. What about how on page 29 of the board's decision, it's talking about the references that were in the petition, Austin and Greyhose, and it relies on Dr. Murthy's testimony, and then at the end it says patent owner responds that a person of ordinary skin only art could not have predicted, and it's not until it mentions that the patent owner responds that the board actually then discusses Siegel, Nomura, and Merton on the following page at page 30. Well, first there's an important clarification about appendix 29. The Murthy citation here is actually to his reply declaration. The citation to Murthy is not from the petition. That's exhibit 1044. I think it's appendix 1726, and the intervener places a lot of emphasis on this aspect of Murthy, but this wasn't even part of the petition. But more to the point, the reasonable expectation of success, the way it was found in appendix 30 and 31, you don't even have to look at Greyhose under the board's logic to find a reasonable expectation of success. In 29, it's reciting the party's arguments. Well, but it ultimately says we accept the petitioner's argument. It recites the argument. It's true, but then at the end it says we accept it. Yeah, it seems to me you have to view what the board is saying is incorporating as its own the arguments made. Well, it's reciting the party's arguments, including the key argument in 29, which didn't come in into the reply. Well, but on this business of the reply, I mean, it does strike me that several of the references you've talked about, Siegel and Nomura, and I guess these all came in. They were introduced in the patent owner's response. The only one of the references that was not, as I understand it, in the patent owner's response was Merton, and that was a reference which Dr. Lane acknowledged in her deposition that she was aware of. In her declaration, I believe, she referred to two other Merton references, which were part of a three-part article that was done by Merton and Lippold. So the notion that you were somehow blindsided by these references, you had an opportunity to discuss those references, and why aren't they legitimate reply to the various arguments that you made in the course of the declarations of your experts? Well, first of all, this is a clarification. I'm not sure about Dr. Lane, but I think what your honor might be referring to is petitioner's expert Dr. Murphy testified he knew about the Merton reference the whole time. He did, and then Dr. Lane subsequently acknowledged that she was aware of the Merton reference, and in fact testified at some length about two of the other related Merton references, and she said, well, I didn't cite the third one, but yeah, I was aware of it. Well, your honor, let me get to the broader point, which is that this case is like Nuvasiv, which is a situation where there are new arguments based on references that are already known about. I think in Nuvasiv, one of the key prior art references, the petition argued that one claim element was in that reference. I think this is an implant case, and then they got another claim element from a different reference. Then on reply, they switched to getting both of those claim elements from the same figure of the same reference. But Nuvasiv makes clear that the prohibition against introducing a new theory or new evidence does not apply when the new evidence is introduced as legitimate reply or response to an argument made by the patent owner. Why is this not a case of legitimate reply? For a couple reasons, because first of all, if you look at the patent owner response, the both parties spent a great deal of time arguing about structural similarity. We argued that you would not have combined Austin with either of the other references because the boron-containing compounds have no meaningful structural similarity. In the reply, there was a new argument like in Nuvasiv with, you know, even granting your references came in before the reply based on a completely different theory. Structural similarity is essentially out the window when it comes to reasonable expectation of success. In order to show reasonable expectation of success for treating dermatophytes, all you need to know is that compound's activity against yeasts. That came in with the reply, which is shown pretty Petitioner completely abandoned the idea that structural similarity was the link between the references. It just pointed to Merton. But why wasn't that legitimate reply to Dr. Ghanoum, who in his declaration and then ultimately in his deposition at great length, he talked about how you could not anticipate effectiveness against dermatophytes based on effectiveness against Candida albicans because he says, here's an example, ketoconazole. And he says ketoconazole has high activity against C. albicans, low activity against dermatophytes. And then Merton is used to cross-examine him about why it is that Merton, for example, shows that a number of anti-mycotics are more effective against dermatophytes than C. albicans. That seems like a legitimate reply. Well, the context of Dr. Ghanoum's testimony was more attacking Brayhove because the issue that we didn't think it was particularly controversial that Austin by itself did not give rise to reasonable expectation of success. The petition, if you look at the claim charts, located that Merton and Brayhove combined, or Brayhove gave rise to a reasonable expectation of success. And in any event, under the statute 312A3, it's in any case the petitioner's burden to show a prima facie case of obviousness. And the basis of their prima facie case, which includes reasonable expectation of success, completely changed from petition to reply. And I think Intervenor tries to argue that we somehow opened the door to this new argument with Dr. Ghanoum, but I don't think that's how the IPR statute contemplates these proceedings going. The fact remains Anacor was sandbagged by a completely new argument, just like in In re Nuvasiv. What's the structural similarity beyond that both compounds contain the boron and heterosexual ring structure? We don't know, your honor, and that's part of our appeal, is that there's no substantial evidence to show the structural similarity link. Was there any evidence presented on that particular issue beyond what I read at appendix 1225? If you look at that paragraph 100, it says the compounds of Brayhove were also boron heterocycles. That's the only statement I found as to any type of structural similarity. That's correct, your honor. We agree that petitioner never identified a meaningful structural similarity. They started out by calling all of these compounds boron-based compounds, and we asked their chemistry expert, well, what does that mean to be boron-based? And he said, well, maybe that was a poor choice of words. What I really meant was boron-containing. But there's literally millions, maybe millions and millions of compounds that have boron in them. And the board, in its ruling, sort of pivoted partially. They said, well, we acknowledge there are structural differences, but there are some similarities, and it didn't really articulate what those were beyond boron heterocycles. But assuming that, let's take that statement as true, and that that's a statement of similarity, what does that do to the reasonable expectation of success when you got that type of structural similarity, this specific structure? You have compounds that share boron heterocycles. Well, I mean, under petitioner's theory, or their original theory that they abandoned- We're still talking about millions of different types of compounds involved, correct? Yeah, yeah. They pick one compound out of Austin's millions and say that would have been the preferred compound. Their original theory is you would plop that compound into a method of treating a human being like allegedly would come out of Brayhove or Freeman. So in terms of substantial evidence, other than this statement here, in your view, is there any type of evidence submitted that would indicate some sort of structural similarity between the two compounds? No, no, we agree. There's no substantial evidence to support any finding that there is structural similarity between any of these compounds. We don't know what the meaningful similarity is. And I would point in particular to the Merck case at intervenor sites, where there was a one atom difference giving rise to structural similarity. Here, there's a lot, I mean, the different structures, some are not planar, some are non-planar. So we agree, there's no substantial evidence. Okay, we drove you past your time. Yeah, I completely burned my rebuttal time, I apologize. No, we'll restore you back to five minutes Thank you, your honor. So other than this statement that I read out of 1225, what's the evidence that shows that structural similarity between the two compounds we're looking at? Yes, your honor. So the structural similarity, I don't think is disputed. It is that they're both boron heterocycles. I think, though, in the context, then, of what the biocide science and the state of the art, that was a sufficient structural similarity for the board to rely on. But just to be clear, there's no other evidence in the record as to structural similarity. There's evidence in the record that one of skill in the art would have thought that that structure was important. So Brehoft... No, no, I know that. Okay. That's not what I'm asking. Is there any other evidence other than this particular point in the record? I mean, that is the structural similarity. The structural similarity is that... And that's the evidence, that's the entire evidence in this case on structural similarity. Right. Do you think there's other evidence that's relied on for purposes of showing that one of ordinary skill in the art would have been motivated to combine the references in the original petition, for example, functional similarity? Right. So the motivation to combine and the reasonable expectation of success is premised on the structural similarity, as well as that Brehoft compounds and taboboral have this identical activity, the biocide or fungicidal activity against C. albicans. And not only that, taboboral had activity against five different yeast species. Only one of them was the C. albicans, and they were all different genuses of yeast. So one of the responses from Anahor is that actually taboboral has quite a broad spectrum, and that was their response about toxicity, the worry about toxicity, because taboboral, in Austin's teaching, actually shows quite by having inhibitory effect against five different genus of yeast, of our fungi, that it would in fact be toxic. And I think going back to the structural similarity too, Brehoft, which has the boron containing compounds, generally teaches that organoboron compounds are known to be biocidal. And so you have this teaching in the art that the boron compound, that structural similarity, is important for one of the skill in the art to understand their function. And then it's not that we just have that structure. We in fact know that taboboral is acting as a fungicide quite broadly. And the Brehoft compounds, it shares a similar activity. And then Brehoft compounds have this in vivo activity. And that is the evidence that the board's relying on for the reasonable expectation of success. That's really the heart of the case, isn't it? The functional as opposed to... I mean, it strikes me, reading this case, that structure was a starting point, but really no more than a starting point. You never would have been able to sustain this case if all you had was structure, I assume you would agree. I absolutely agree. So what really matters is the function. And there you have the Brehoft with the in vivo in particular against onychomycosis, which is mostly dermatophytes, about 90%. So presumably the individuals that were successfully treated in Brehoft had the odds are very high that they had dermatophytes. That's correct. And so you've got Brehoft showing activity against dermatophytes. And then you question the functional comparison between Brehoft, which treats C. albicans, and Austin, which treats C. albicans. And then you're there, right? Right. That was the basis of the petition. And of course, they had many responses. And one of the arguments they teased out was that one of skill in the art wouldn't have been able to predict this activity against dermatocytes based on activity against C. albicans. And so the petition had there all the evidence we've discussed about for the reasonable expectation of success. Anacor came back with their response that you wouldn't have been able to predict this activity based on C. albicans. And the board then addresses that dispute between the parties in determining a reasonable expectation of success. Let's look at this issue of effectiveness of the function. And I refer you to J62.19. I'm sorry, say again? J62.19 is table one. This is Anacor's expert that presented this table that shows, for example, in the first compound, which is Tavoboroli. Okay. And then we go down to A. And there's just a very minor change in the structure, extremely minor. In fact, an untrained eye will look at the structure of these two compounds and say they're very similar. But there's been a change, a very small one. And look at the effective rate. Yes. And it's much, much less effective. And when you go down the line here, you're changing the different structure, making minute changes. Then you see dramatic shifts in effectiveness of the drug. That's correct. And the point there, and structural differences do matter. And when you have a compound, starting with Tavoboroli, and you're going to change it, I absolutely agree that you wouldn't be able to predict, based on that structural change alone, whether you were going to have a compound that was fungicidal, that had activity against the albicons. But that's not the situation here. We know Tavoboroli is a... So does function, in terms of reasonable expectation of success, does similarity of function trump similarity of structure, or dissimilarity of structures? Well, I think it does in this case. I mean, I think there's background information about boron-containing compounds having similar activities, just based on that structure. But once you look at the evidence that was introduced on the reasonable expectation of success, you have very different compounds in Seagull, Nemora, and Merton, having activity based on yeast, and having activity then on dermatocytes. So it tends to show you that once you know a compound is fungicidal against yeast, you have a reasonable expectation that it would also be fungicidal against dermatocytes, regardless of the structure. But if you don't know anything about the compound's activity, like the different compounds in that chart, when you change the structure, and you don't know anything about that compound's function, I agree, you can't predict what that function is. But what does that do when we look at the similarity of function or the activity? Similarity of activity of two compounds. And we say that's enough, when there's similarity in function, that's enough to have a motivation to combine. But let's say that happens where you have two compounds that are structurally very dissimilar, and what does that do to the reasonable, aren't we talking about a reasonable expectation of success here? Right, we are. So I'm not quite sure I understand your honors question, but let me see. It seems to me you're arguing that a reasonable expectation of success doesn't matter in situations where you have similarity of function. Well, reasonable expectation of success absolutely matters. When would you look at it in a situation, even here, where you say, well, we have two compounds, forget about their structural similarities or differences. There's a similarity in activity or in function, that should be enough. We don't have to go to the question of reasonable expectation of success. Because you've succeeded. You have two compounds that basically are functioning alike. But here we don't, that's true. We know that they have a similar function in terms of acting against the albicons, but we don't have direct proof for the tavoboryl acting against dermatocytes. And that's why we need the evidence about whether we would have a reasonable expectation of success. So your argument, as I understand it, is that in the area, at least, of fungicides, which Dr. Cald described as simple organisms, you expect to have broad-spectrum effectiveness. And there's evidence of that. And the broad-spectrum effectiveness means that if you have a compound which is effective against the albicans, you can infer that it's likely to be effective against dermatophytes. That's your argument in a nutshell, is it not? And that's what the board, essentially deciding the dispute between the parties, said that is true. You would have a reasonable expectation of success once you knew that a compound had activity of C. albicans. But you also, this is still determining that reasonable expectation of success based on the teachings of Austin and Breedl, but still based on the same hobbies. I understand that. Let me ask you a question about the Merton reference. Now, Merton was not, of course, in the petition. It popped up, I guess, well, before that, in the course of the depositions. I think it was, was that in Ghanoum's deposition? I think so. It may also have been in Dr. Lane's deposition. But explain why it is that that is not a problem, in that that reference came in belatedly, not in the petition in any event. The petitioner relied on Merton to directly respond to the patent owner's response. And the patent owner's response had the Siegel and the Nomura reference to support an argument that one wouldn't have predicted activity based on C. albicans to get to dermatocytes. And the Merton reference then was a direct response, as the board found, to that argument made in the patent owner's response. So it was just in general, the evidence that you've put in supports our position. But also, we have the Merton reference that shows, in general, a compound that has activity against yeast also has a low inhibitory concentration against dermatocytes. And that answers the dispute between the parties during the IPR that was raised by the patent owner about whether there would be a reasonable expectation of success based on the obviousness of the ground asserted in the petition. Would a patient expect an industrial biocide to be safe for humans? Well, the Brehove compounds are an industrial biocide, and they were used on patients safely. The Anacor made that argument to the board that you would expect these compounds to be toxic. I don't read their brief as making that argument here. I think it actually, their argument about toxicity also was quite, it relied on the same structural similarity. Their argument was boron-containing compounds are toxic without any regard for the rest of the structure. And so the evidence before the board was both parties were relying on this similar boron structure to determine function. Would toxicity on human beings affect the argument on reasonable expectation of success? If they had raised that, I mean, they raised that argument to the board, and yes, it can affect whether there's a reasonable expectation of success. But the board found that their evidence was insufficient because it relied on a discredited article. It relied on studies that were- Let's say, would I, what if I found out that there is a certain model of Roundup, the weed killer, that also kills this fungicide? Would a poseidon look at that and go, well, this Roundup I use on my lawn also kills this particular fungus. Let me combine with that. I mean, on that hypothetical, if you knew, if you had a compound that was acting against yeast, the C. albicans, that's a cause of onychomycosis, that seems, I mean, I don't know anything about the structure of Roundup. I don't know anything else about- Well, that's just the point. Wouldn't a poseidon have to, at that point, look at the structure of the two compounds in order to determine whether there's similarity? Yeah, and their structure is playing a role in this because they do have a similar relevant structure. And for a non-no-com, we just pull it- But under your argument, structure plays no role. No, I think it does- I mean, you can't say that these are structurally similar. They're structurally similar in the relevant part. As the art tells, Brehove talks about, and there's references that talk, one of the references that Petitioner has in the record, it's at APPX 1546, and it's boron therapeutics on the horizon. People are interested in boron in general, and it says that agents including boronic acids, which are in Freeman, and boron heterocyclics are potential proteasome inhibitors and other things. So the references in the art are saying, this is the relevant structural similarity that you need to look for if you're looking for a fungicide or a therapeutic activity. And I'd just like to point out, so Anacor did not- Anacor's argument for Freeman does not encompass the lack of notice, the APA challenge. The board found that Anacor did not argue Claim 6 separately. And Claim 6 then, the determination from Claim 6 was based on the board's findings for the independent claims, Claim 1, 11, and 12 alone. So every time Anacor says that the board made a similar decision, they're not pointing to a decision in the board's decision based on Claim 6, but a similar decision based on the independent claims. And so they did not preserve that argument, the APA argument for Claim 6. And there are arguments- So I understand your argument well. I'll get to the point what concerns me here with the argument. In cases involving pharmaceutical compounds, I mean, we repeatedly have held and we've recognized that a prior compound and a claim compound have a sufficiently close relationship turns on their structural similarities or differences. And we said that in Diachi, in Ray Dillon, and basically that's almost a rule of thumb. And I point out to your honor, those cases- Or a rule of law. Yes, your honor. I would point out those cases are claims to new compounds. So when you know nothing about a compound and you're claiming a new compound and the activity of a new compound, then you're absolutely right. Once you have a new compound, you don't know what that function is going to be. What authority can you cite to me to support that position that you have, that when we're dealing with new compounds, structural similarities doesn't matter? Well, it's not that it doesn't. I don't want you to- It's not that it doesn't matter. You don't have a legal authority to back that up, right? Well, Merck is the closest and it's not necessarily a great case because it is about compounds that are structurally similar. So they did look at function. I mean, I think the Nanquist case, it's not Merck, it's sort of the closest, but it's not chemical compounds. It's two different cell lines and basing- I mean, the cell lines, the arguments were that they have different receptors, they have different functions and all this, but they both had a relevant similar function, the lysis in vitro of cancer cells. The unclaimed cell line also worked in vivo. And the court found, it's again, unprecedential, that you would have had a reasonable expectation that that now claimed cell line would also have in vivo activity. So with that, unless there's any other questions, I'd ask the court to affirm. Thank you very much. I'd like to first very briefly address the waiver point that the intervener made. We did argue Claim 6 separately for Freeman. We had an argument, I believe, is it Appendix 424 to 426, where we said there was no evidence in Freeman that taboborrel would have been effective against dermatophytes. The only claim in the patent to which that argument is relevant is Claim 6. So when the board said that we didn't separately argue Claim 6 for Freeman, they were simply mistaken. And similarly, our opening- So just to make clear, in this part that you're relying on, there's no reference to Claim 6. But you're saying that because this limitation is only found in Claim 6, the board should have inferred or understood that you were arguing Claim 6 separately. Correct. This is from our patent owner response. And Your Honor doesn't have the entire patent owner response, but I think in context of what we were arguing, it should have been clear that dermatophyte discussions are relevant to Claim 6. And in our opening brief, we did argue there was an APA violation with respect to both grounds. And the board addressed that in a footnote, is that right? Yeah, in footnote one of the opinion, the board disagreed with our contention that the petitioner had raised a bunch of new arguments. We made a motion to strike, and the board allowed us to identify the new arguments, but then as part of the final written decision, decided that they weren't new arguments. But the board decided they were a legitimate reply, if I recall the footnote. That's correct. So let me just, some context to the discussion you just had with Intervenors Council. These claims aren't drawn to fungicides. They're drawn to methods of treating human beings. And so comments to the effect that a given compound has broad spectrum activity, or it has good in vitro activity, we would submit doesn't really show reasonable expectation of success. But BRIHO shows an in vivo test whether it's successful with human beings directed to onychomycosis. It does. It has a few patient examples. It doesn't say what... No, for a few reasons. You haven't argued toxicity, as I understand it. Not on appeal. Just to have a narrow appeal, we focused on Claim 6. But let me make a couple points about BRIHO. First of all, the patient examples in BRIHO don't identify what caused their onychomycosis. So I think Your Honor alluded to, well, playing the percentages, you know, maybe some of them had dermatophytes. It's a pretty good assumption statistically, isn't it? Not exactly, because BRIHO also says that C. albicans is the primary cause of onychomycosis, which is incorrect. But it seems to be what the BRIHO inventors thought. And their only in vitro data was for C. albicans. So I do think it's a little ambitious to simply assume that BRIHO shows a reasonable expectation of success. In any event, those were very... But there's no indication that the patients in BRIHO were selected as C. albicans sufferers, as opposed to dermatophytes. Well, we don't know... They were just... Yeah, there's not a lot of detail. Onychomycosis patients. Yeah, they don't say... They don't affirmatively say what they had either way. But in any event, BRIHO has very different boron-containing compounds than Austin. And you need Austin, because that's the only disclosure of taboborol. And that takes us back to the point of, how do you link Austin and either of the other two references? So we still don't really know what... So the petition tried to do that with structural similarity and overlapping functional activity. We still don't know what the structural similarity is. And boron can't be enough to establish structural similarity. And we know that from Austin and Freeman themselves. The Austin reference, for example, at 1067. So this is the in vitro data at issue. Compound 64 is taboborol. And just to navigate around a little bit, the column that says CA, that's C albican. And the five indicates that compound 64 had activity against C albicans. Well, and against an extremely good activity against all five of the fungi, right? Well, that's fine. But then look at compound 72, which is the same as taboborol, except it adds, I believe, a methyl group. That compound didn't do anything. So you change one substituent on this class of boron-based compounds from which taboborol comes from, and you have no activity. I think that really goes, by itself, that goes a long way to defeating any notion that structural similarity here can give rise to any sort of reasonable expectation of arriving at claim six. I would also note Freeman at 1099, the in vitro data. I'm gonna ask you to wind up. You're out of time, but you can make a conclusion. Freeman is to the same effect. Very different activity, depending on which compound you're talking about. So for these reasons, and this is just to wrap up very briefly. Because of these problems in the structural similarity case, Petitioner abandoned structural similarity and instead just said, forget about Brayhove, forget about Freeman. Just look at Austin's data against the yeast. And then based on all this other evidence that wasn't in our petition, just assume that a compound that works against the yeast will work even better against the grammatophyte. That's a new argument that should not have been permitted. Thank you, guys.